## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW
## YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | CIVIL NO. |
| STATE OF NEW YORK | § | |
| ex rel. Clifford Weiner, | § | |
| | § | FILED UNDER SEAL |
| Plaintiff, | § | |
| | § | PLAINTIFF'S COMPLAINT |
| VS. | § | PURSUANT TO |
| | § | 31 U.S.C. §§ 3729–3732, FEDERAL |
| SIEMENS AG, SIEMENS | § | FALSE CLAIMS ACT AND |
| CORPORATION, SIEMENS | § | ARTICLE VIII OF THE NEW YORK |
| INDUSTRY, SIEMENS SCHLESINGER | § | FINANCE LAW, THE NEW YORK |
| ELECTRIC, LLC, JOHN DOE'S 1-100 | § | FALSE CLAIMS ACT |
| and JANE DOE CORPORATIONS 1-100 | § | |
| | § | |
| Defendants. | § | |
| | § | JURY TRIAL DEMANDED |

## INTRODUCTION

Relator Clifford Weiner brings this Qui Tam action on behalf of the United States of America and the State of New York, by and through his undersigned attorneys the Law Offices of Sean R. Callagy, Esq., brings this action under 31 U.S.C. §§ 3729–3732 ("False Claims Act" or "FCA") and Art. XIII of the New York State Finance Law ("NY False Claims Act" or "NYFCA") to recover all damages, penalties and other remedies established by the False Claims Act on behalf of the United States and the New York False Claims Act on behalf of the State of New York and himself and would show the following:

## I.    PARTIES

1.    Relator Clifford Weiner ("Weiner") is a citizen of the United States and a resident of the state of New Jersey.

2.    Defendant Siemens Aktiengesellschaft ("Siemens AG") is a corporation organized under the laws of the Federal Republic of Germany with its principal offices in Berlin and Munich, Germany.  It has widespread, systematic, and continuous business dealings in the United States and the State of New York. Defendant Siemens AG may be served with process via its registered agent at Wittelsbacherplatz 2 Munich D-80333, Germany.

3.    Defendant Siemens Corporation is a corporation incorporated under the laws of Delaware with its principal place of business in New York.  It may be served through its registered agent, The Corporation Trust Co., Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware  19801.

4.    Defendant Siemens Industry (formerly Siemens Energy and Automation, et. al.) is a corporation incorporated under the laws of Delaware. It may be served through its registered agent at 170 Wood Avenue South, Iselin, New Jersey 08330.

5.    Defendant Schlesinger-Siemens Electric, LLC is a corporation incorporated under the laws of Delaware with its principal place of business in New York. It may be served through its registered agent at 600 East 125th Street, New York, NY 10035.

6.    Defendants Siemens AG, Siemens Corporation, Siemens Industry, and Siemens Schlesinger Electric are referred to herein collectively as "Siemens."

## II.    JURISDICTION AND VENUE

7.    Jurisdiction and venue are proper in this Court pursuant to the False Claims Act (31 U.S.C. § 3732(a)) because Relator's claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. § 3729 in the United States by all or any one of the Siemens

2

defendants, some of which, upon information and belief, occurred in the Southern District of New York, and because, based on information and belief, all or any one of the Siemens defendants transact other business within the Southern District of New York.

8.      The claims under the NY False Claims Act are specifically authorized by § 190 (2) of the New York State Finance Law. These claims "are so related to the claims within" this Court's original jurisdiction over the federal claims to be within the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367.

9.      The fraudulent conduct at issue in this proceeding occurred, in part, within the Southern District of New York venue is therefore appropriate in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732.

## III.   REGULATORY BACKGROUND

### A.   Master Electrician License

10.      Under Wicks Law (N.Y. Gen. Mun. Law § 101) public officials charged with entering into contract for construction, "when the entire cost of such public work shall exceed three million dollars in the counties of the Bronx, Kings, New York, Queens, and Richmond… shall prepare separate specifications for…" plumbing, heating ventilation and air conditioning, and electrical wiring and lighting.  N.Y. Gen. Mun. Law § 101(1).  The law requires that "[s]uch specifications shall be drawn so as to permit separate and independent bidding upon each of the above three subdivisions of work."  N.Y. Gen. Mun. Law § 101(2).  The three subdivisions of work are to then be awarded separately.  *Id.*

11.      The City of New York requires licensure as either a Master or Special Electrician in order to perform electrical work.  New York, N.Y., Administrative Law § 27-3017(a)(1)(2011). The statute explicitly states "it shall be unlawful for any person to perform electrical work except under a license issued to a master electrician or special electrician as provided in this chapter."  *Id.*

The law is further restrictive prohibiting advertising oneself as a licensed electrician or otherwise falsely representing oneself as a licensed electrician if not licensed as either a Master Electrician or Special Electrician. *Id.*

### B.   Minority Business Enterprise Program

12.   Under N.Y. Exec. Law § 310(7) in order for a business enterprise to be classified as a "Minority-owned business enterprise," it must meet the following six criteria. First, the business must be "at least fifty-one percent owned by one or more minority group members." N.Y. Exec. Law § 310(7)(a). A minority group member is defined as follows:

> [A] United States citizen or permanent resident alien who is and can demonstrate membership in one of the following groups:
> (a) Black persons having origins in any of the Black African racial groups;
> (b) Hispanic persons of Mexican, Puerto Rican, Dominican, Cuban, Central or South American of either Indian or Hispanic origin, regardless of race;
> (c) Native American or Alaskan native persons having origins in any of the original peoples of North America.
> (d) Asian and Pacific Islander persons having origins in any of the Far East countries, South East Asia, the Indian subcontinent or the Pacific Islands.

N.Y. Exec. Law § 310(8).

Additionally, the ownership must be "real, substantial and continuing"; the minority ownership must "exercise[]the authority to control independently the day-to-day business decisions of the enterprise"; the enterprise must be authorized to do business in state of New York and be independently owned and operated; and the enterprise must be a "small business." A small business is defined as follows:

> [A] business which has a significant business presence in the state, is independently owned and operated, not dominant in its field and employs, based on its industry, a certain number of persons as determined by the director, but not to exceed three hundred, taking into consideration factors which include, but are not limited to, federal small business administration standards pursuant to 13 CFR part 121 and any amendments thereto. The director may issue regulations on the construction of the terms in this definition.

> N.Y. Exec. Law § 310(20).

4

Finally, in order to be considered a minority-owned business enterprise the enterprise must be "enterprise owned by an individual or individuals, whose ownership, control and operation are relied upon for certification." Those individuals must not have a net worth in excess of three million five hundred thousand dollars (adjusted according to the previous year's for inflation according to the consumer price index).

## IV.   FACTUAL ALLEGATIONS

### A.   Overview of Relationship with Siemens

13.   In 2002, Relator Clifford Weiner ("Weiner") was approached by Siemens Westinghouse Industrial Services ("Siemens") about working in partnership with them to pursue NYCDEP ("New York City Department of Environmental Protection") prime electrical contracts. In the years 2002 and 2003, Weiner and Siemens unsuccessfully attempted to secure several prime contracts.

14.   In 2002, Clifford Weiner also began a relationship with First Keystone Consultants ("Keystone") and Schlesinger Electrical Contractors, Inc. ("SEC"). This relationship was established so as to bid on public works electrical projects including those with the New York Department of Environmental Protection ("NYDEP"), the NYCDEP, and other opportunities that may become available.

15.   Weiner formed DDR Construction Services ("DDR") in 2004 to secure, partner in, and manage for SEC a five and one half million dollar ($5.5 million) electrical contract at the Coney Island Sewage Treatment Plant ("CIWP").

16.   It became apparent to Weiner that in order to successfully pursue projects of the size and capacity that Siemens envisioned, it would require a scale and capabilities that exceeded DDR's abilities. Weiner determined that the logical solution was to build on the successful

partnership created for the CIWP.

17. The relationship between DDR, Keystone, and SEC was reduced to a partnership agreement which created SFD Associates ("SFD") so as to present a single entity for bidding on projects.

18. After a number of unsuccessful submissions for projects, Weiner reached out to Jeff Deurlien at Siemens Electric and Automation ("SEA," later to be merged into Siemens Industry) to discuss the possibility of creating a joint venture between Siemens and SFD to pursue further bids. This joint venture was ultimately established by the creation of a Limited Liability Company, specifically Siemens-Schlesinger Electric, LLC ("SSE").

19. The arrangement with SSE provided that contracts stemming from bids won would be split between Siemens and SEC (which held its interest in SSE in trust for the SFD partners). This structure was created to comply with the requirements of the Wicks Law that one partner of a joint venture bidding on a prime electrical contract hold a master electrician's license. Siemens was aware at all times the relationship. Through this arrangement, SSE began to bid for projects.

20. As a result of this arrangement, SSE submitted successful bids for seven projects with the NYCDEP. These projects included the following: 26th Ward for $21,280,000; WI 79E for $29,425,855; WI 87E for $11,745,000; Croton E1 for $134,680,000; Croton E2 for $ 37,678,000; Sharon for $ 2,700,000; and B&E Controls for $2,100,000.

21. The NYCDEP receives approximately eighty per cent of its funding from the New York State Revolving Clean Water Fund which, in return, is funded by Federal Environmental Protection Agency ("EPA") through the Clean Water Revolving Fund.

**B.     Relator Clifford Weiner's Discovery of Siemens's Fraudulent Conduct**

22. It is through his participation in these seven contracts supported by the NYCDEP

6

that Weiner became personally aware of the false claims submitted by Siemens.

23.    DDR was forced out of SFD by a fraudulent capital call designed to make it impossible that DDR could remain a member of this entity. After DDR was thrown out the fraudulent capital call was rescinded thus, SEC and Keystone were allowed to remain.

i.    **Specific Misrepresentations by Siemens**

24.    Under existing law, only a licensed electrical contractor is eligible to be awarded a prime electric contract. The exception to this is a joint venture where one member is a licensed electrical contractor.

25.    SSE knowingly falsely certified to the NYCDEP on at least five Bids that it was a Joint Venture whereas in reality it was an LLC. [1]

26. A May 10, 2005 internal email from Jeff Durlein of Siemens (SEA) titled "Notes from Board" clearly stated Siemens intent to mislead and knowledge of falsity the NY DEP and stated:

4.   LLC Electrical License

   •   Need to portray the LLC as a JV with the NY DEP. There is a history of JV's in the NY DEP bids. [2]

27.    After SSE was low bid on the Wards Island 79E project, NYCDEP requested the joint venture agreement between SSE and SEA. [3]

28.    Rather than produce any proof of a joint venture between the two, Siemens elected to fraudulently represent SSE as a Master Electrician business with Bronislav (Steve) Ostrovsky ("Ostrovsky") as its licensed master electrician.

29.    To avoid the cost and legal mandate of a full time corporate officer who held a

---

[1] See Exhibit A, relevant pages from 5 Bid applications wherein SSE certified that they were a Joint Venture.
[2] See Exhibit B, May 10, 2005 email from Jeff Duerlein entitled Notes from Board- April 27th about Paedergat.
[3] See Exhibit C, Letter from NYCDEP requesting Joint Venture agreement.

master electrician's license as the responsible representative of SSE, Siemens instead negotiated an illegal side agreement with Ostrovsky to improperly use his dormant license for a nominal fee of $1500 per month.[4]

30.     Neither SSE nor Ostrovsky ever intended for Ostrovsky to act as a bona fide Officer of SSE with a Master Electrician's license as required, but rather SSE's entire relationship with Ostrovsky was a sham by SSE to use Ostrovsky's dormant license so Siemens could bid on, and ultimately secure public works contracts.

31.     Siemens submitted false affidavits and claims to the city of New York relating to Ostrovsky and the use of his license. Specifically, on February 10, 2006, Robert H. Rigsby, in-house counsel to Siemens USA and Secretary to Schlesinger Siemens Electrical, LLC sent a letter to The City of New York stating that Bronislav Ostrovsky was Vice President, Electrical of Siemens Schlesinger Electric and a member of the Board of Managers.[5]

32.     Rigsby did not submit a notarized copy of the actual minutes of the Board naming Ostrovsky to the Board as required, but instead submitted a Certification, dated March 6, 2005 and signed by the Managers stating that the Board elected Ostrovsky as an Officer on January 26, 2006.

33.     The January 26, 2006 date was fraudulently offered to the City as a ruse to make it appear that Ostrovsky was added to the Board before this issue arose, but in fact, that date predates Durlein's February 6, 2006 email wherein Durlein stated that the "LLC will be contracting with a gentlemen named Bronislav Ostrovsky (Steve) to act as the VP of Electrical Operations for the LLC. This position is granted to him so that he can carry the Electrical Contracting License for the LLC. We will pay him some nominal fee around $1000-$1500 per month for this service. To do this, we will need some agreement/contract between Steve and the LLC. Do we have a standard

---

[4] See Exhibit D, February 7, 2006 email from Deurlein outlining the intent and scheme to use Ostrovsky's license.
[5] See Exhibit E, February 10, 2006 letter from Robert H. Rigsby to The City of New York.

agreement in which we can start with. What do we need to do to get this done"[6]

34.      Clearly, as of February 6, 2006, the date of Deurlein's email, no formal agreement as to the scheme involving Ostovsky had been executed and in no way had Ostrovsky been named to the Board some twelve days earlier as each member of the Board swore to in their Certification, and Rigsby, as Secretary and counsel to Siemens USA stated in his letter.

35.      Moreover, at all times that Ostrovsky's license was registered to SSE, he was in fact a full time working employee of Five Star Electrical Contractors,[7] Inc. in contravention of § 27-3013 Business Establishments Master Electricians And Special Electrician, which requires that a Master Electrician can only represent one business and that the Master Electrician must devote his full time to that business.

36.      Ostrovsky did not renew his license in December 2007.  SSE concealed this from the City of New York by failing to notify the City of that fact, despite their affirmative obligation to do pursuant to § 27-3013 (8).  Thus, for well over a year until discovered by NYCDEP and the New York City Department of Investigation ("NYCDOI"), SSE continued to operate itself under the fraudulent umbrella of a Master Electrician Business despite the fact that that the very license they had fraudulently paid to use had then been expired for over eighteen months.[8]

37.      Upon discovery, Siemens then advised the city of New York that Ralph Scotti ("Scotti") would then assume the role of SSE's Master Electrician.  Siemens was once again engaging in the same type of sham relationship as it relates to the Master Electrician requirement.[9]

38.      Scotti's license as Master Electrician to Siemens was also issued based upon fraudulent documentation submitted by Siemens.

---

[6] See Exhibit D, *supra*.
[7] See Exhibit F, Affidavit of Ira Grunther, Senior Vice President of Five Star Electric.
[8] See Exhibit G, email between Mark Reed and Steve Hammel regarding lack of Electrical License during the entire year of 2008.
[9] See Exhibit H, email from Roland Dung, CEO of SSE to Michael Borsykoski.

39.     Roland Dung, CEO of SSE fraudulently represented to Michael Borsykowsky of NYCDEP that Scotti was superintendent of SSE.

40.     This is a lie. Scotti is in fact the superintendent for SEC, a continuing going concern as a Master Electrician Business.[10]

41.     Scotti, like Ostrovsky cannot simultaneously serve as a Licensee Representative of Master Electrician Business while also serving as the Superintendent for another Master Electrician Business.

42.     As of today, Scotti's license serves as the Master Electrician for SSE even though he is a full time employee and superintendent of SEC.

43.     Federal regulations mandate that the contracts issued by NYCDEP have set asides for Minority Business Enterprises ("MBE"). To this end, Siemens engineered a relationship with J&R Rey Electrical Contractors ("J&R").

44.     Under the guise of this relationship many frauds were committed.

45.     For example, as a condition of being a participant on one project known as the 26th Ward Project awarded in September, 2005, Siemens fraudulently required that J&R purchase approximately $2.4 million of equipment manufactured and sold by Siemens, out of the $3.6 million that J&R was to receive from the contract.[11]

46.     In addition to being an illegal kickback scheme, the requirement that J&R purchase this equipment from SEA, at a price set by SEA, also constitutes a fraudulent representation by Siemens that J&R Rey was performing a "useful commercial function" as required by the MBE requirements.

47.     In July 2007, the NYCDEP questioned the purchase of the equipment and other issues as it related to the use of J&R Rey as an MBE, stating their concern that J&R Rey was

---

[10] See Exhibit I, 2008 SEC Ledger showing Scotti as employee and SSE NY License showing Scotti as master electrician.
[11] See Exhibit J, August 11, Affidavit of John Rey.

simply being used by Siemens as a "passive conduit of funds." [12]

48.     As a result, Siemens responded by creating and submitting a false quote to the NYCDEP that they claim was previously submitted to J&R Rey, purportedly prior to purchase of the equipment, which they claim proves J&R Rey independently chose to purchase the equipment from Siemens.[13].

49.     Remarkably, Siemens was not careful in creating this false document which purported to be a quote for equipment prior to purchase because they mistakenly dated it June 1, 2007, some months *after* the Siemens equipment had already been purchased and after had been substantially installed.

50.     J&R Rey was also forced by Siemens to submit $360,000 in invoices for future labor. These checks were then cashed at check cashing facilities in New York City. [14]

51.     Unbeknownst to John Rey, Siemens continued to fraudulently use J&R Rey to win MBE contracts even after Siemens terminated J&R Rey. [15]

52.     Siemens had previously included J&R Rey as the MBE subcontractor for the five aforementioned projects.

53.     Siemens later constructively terminated J&R Rey from all five projects by approximately October, 2008.

54.     In January 2009, Kenneth Schill fraudulently submitted a document to the NYCDEP requesting approval for J&R Rey as the MBE subcontractor for the project known as WI79E, after his termination from that project.

55.     J&R Rey did not learn that Siemens continued to submit his name as an MBE subcontractor until sometime around May 2010, wherein he learned of this fact through a FOIA

---

[12] See Exhibit K, July 13, 2007, Letter from Alan Wasserman to Jeff Durlein.
[13] Exhibit L, Email from Durlein to Wasserman with Scope of Supply attachment dated June 1, 2007.
[14] See Exhibit I, Affidavit of John Rey.
[15] See Exhibit M, letter from J&R Rey.

request.

56.     At the direction of Robert Solomon, General Manager of SSE, Rey was also required to kick back approximately 70% or $111,000 of the $153,000 handling costs that were to be paid by Siemens to J&R Rey for processing the equipment order for the 26 Ward Project, that Rey was entitled to pursuant to his contract. Up to two thirds of the mark-up was due in the contract as a kickback.[16]

57.     A similar scheme was used by Siemens to create a pass through for equipment purchased by A-Tech Electric.

58.     A-Tech Electric replaced J&R Rey as the MBE subcontractor on the project known as WI 87E.[17]

59.     A-Tech Electric was also required to purchase Siemens equipment as part of their contract with SEC.[18]

60.     SEC and SSE also conspired to set-up a sham invoice system to allegedly allow Corporate Officer Joseph Guddemi to receive payment while avoiding having to pay his IRS lien.

61.     Joseph Guddemi ("Guddemi") functioned as Chief Financial Officer of SSE. [19]

62.     Allison Consulting is a company owned in Guddemi's daughter's name. Guddemi was allegedly the only employee of Allison Contracting. Guddemi is listed with New York State as the Principal Officer of Allison Consulting and the registered address of Allison is Guddemi's personal residence. [20]

63.     Guddemi personally told Relator that he had a prior IRS lien against him for his roles in schemes to defraud the United States Government of tax revenue while he was an Officer

---

[16] See Exhibit N, Statement and Invoices of John Rey.
[17] See Exhibit O, Letter Dung Letter to NYCDEP and notice of revised MBE.
[18] See Exhibit P, A-Tech Invoice for Siemens equipment.
[19] See Exhibit Q, Guddemi Affidavit, paragraph 2.
[20]See Exhibit R, Allison Consulting Corporate Document.

of PEM Electric Corp. See In re PEM Electrical Corp, Case No.:03-13358, U.S. Bankruptcy Court, Southern District of New York.

64. Allison Consulting submitted all invoices for Guddemi's services to SSE to SEC. SEC paid the Allison invoices on behalf of SSE, then billed SEC.[21]

65. During the same time period as the above questionable corporate activities were occurring Guddemi was on the payroll of J&R Rey.[22]

66. Guddemi was not performing any duties for J&R Rey but Rey was required to put Guiddemi on his payroll for a nominal amount so the IRS could garnish those wages and not the more lucrative wages paid to Allison.

67. Relator has reason to believe SSE installed unapproved, substandard electrical conduits and fittings on the project known as Croton E1 and E2.

68. Relator via FOIA request received copies of construction deficiency reports for the projects.

69. CD # 312E1-037 acknowledges that substandard couplings were used in the Croton Project and directed SSE to replace the couplings.[23]

70. These same couplings were from a Chinese company that had previously created fraudulent underwriters' laboratory labels for their products. [24]

71. A subsequent investigation that was performed at the direction of the New York District Attorney's Office based upon the information provided by Relator led to a finding that the couplings that were actually installed were indeed the improperly galvanized fittings.[25]

72. These inferior couplings do not conform with the requirements of the Project, were

---

[21]See Exhibit S, Invoices for Allison Consulting.
[22] See Exhibit T, Proof of J&R payroll to Guddemi and Letter for John Rey.
[23] See Exhibit U, Construction Deficiency Report.
[24] See Exhibit V, UL warning.
[25] See Exhibit W, Test Results for Coupling and Conduit.

never approved for the Project and could potentially weaken the entire structure over time.

73.     By information and belief, Siemens has engaged in a number of other fraudulent schemes throughout the United States and is subject to many deferred prosecution agreements that may be violated by further fraudulent activity in the company.

## V.     ACTIONABLE CONDUCT BY SIEMENS UNDER THE FEDERAL FALSE CLAIMS ACT AND THE NEW YORK FALSE CLAIMS ACT

74.     This is an action to recover damages and civil penalties on behalf of the United States and Relator arising from the false or fraudulent claims submitted by Siemens in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729–3732 (2000).

75.     The False Claims Act ("FCA") provides that any person who:

(A)     knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(B)     knowingly makes, uses, or causes to be or used, a false record or statement to get a false or fraudulent claim;

(C)     conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; or

(D)     knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government

31 U.S.C. §§ 3729.

(a)     is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three (3) times the amount of damages sustained by the Government because of the false or fraudulent claim.

31 U.S.C. § 3729(a).

76.     The FCA allows any persons having knowledge of a false or fraudulent claim against the Government to bring an action in federal district court for himself and for the

Government and to share in any recovery. 31 U.S.C. § 3730. As required under the FCA, qui tam Relator/Plaintiff has provided the Attorney General of the United States and the United States Attorney for the Southern District of New York a statement of all material evidence and information related to this complaint. That disclosure statement was supported by documentary evidence that verifies the wrongdoing. There are no bars to recovery under section 3730(e), and, or in the alternative, Relator is an original source as defined therein.

77.     This is an action to recover damages and civil penalties on behalf of the State of New York and Relator arising from the false or fraudulent claims submitted by Siemens in violation of the New York False Claims Act, Art. XIII of the New York Finance Law.

78.     The New York False Claims Act provides that any person who:

(a) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(c) conspires to commit a violation of paragraph (a), (b), (d), (e), (f) or (g) of this subdivision; [...]

(g) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government shall be liable to the state or a local government, as applicable, for a civil penalty of not less than six thousand dollars and not more than twelve thousand dollars, plus three times the amount of all damages, including consequential damages, which the state or local government sustains because of the act of that person.

N.Y. State Fin. §189(1).

79.     The NY False Claims Act allows any persons having knowledge of a false or fraudulent claim against the Government of the State of New York or any local government to bring an action for himself and for the Government and to share in any recovery. N.Y. State Fin. § 1 9 0 ( 2 ). As required under the NY False Claims Act, qui tam Relator/Plaintiff has provided

15

the State of New York a statement of all material evidence and information related to this complaint. That disclosure statement was supported by documentary evidence that verifies the wrongdoing. There are no bars to recovery under § 190(9), and, or in the alternative, Relator is an original source as defined therein.

80.    Based on these provisions, Weiner, on behalf of the United States and the State of New York, seeks through this action to recover damages and civil penalties arising from Siemens's submission of false or fraudulent claims for payment or approval.   In this case, such claims were submitted to Government entity of the New York City Department of Environmental Protection. Qui tam Relator/Plaintiff believes that the United States and the State of New York have suffered significant damages as a result of Siemens's false claims.

81.    Siemens misrepresented its activities, including, but not limited to, MBE fraud, use of substandard equipment, and license fraud. These representations were material because the Government did not receive the services or the products that it required, paid for, and through contract had every right to expect.

## VI.    CAUSES OF ACTION

### Count I. – Minority Business Enterprise Fraud

82.    Relator repeats all of the above allegations, with the same force and effect as if set forth in full herein.

83.    Meeting the requirements of the MBE program was necessary in order to obtain funding through the NYCDEP.

84. Siemens stated that the company was using J&R Rey as an MBE participant to the contract.

85.    J&R Rey was utilized to meet the requirement, although the company received no real work and was remitting a kickback to Siemens.

86.    Siemens submitted "claims" for payment based upon a requirement that was not met

16

i n their agreement.

87. Request for payment of contract work not fulfilled constitutes a "claim" within the meaning of the Federal False Claims Act, 31 U.S.C. § 3729 et seq. and the NY False Claims Act, N.Y. State Fin. § 188(2)

88. Siemens submitted claims for payment of expenses under this contract with the specific intention of having such claims "paid or approved" by the United States of America (31 § U.S.C. 3729 (a) (2)) or "reimburse[d to] such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded" by the City of New York.

89. Siemens obtained funds under this contract from the United States of America and the State of New York based upon its false claims.

90. Siemens obtained funds under this contract from the United States of America and the State of New York based upon its false claims. Upon information and belief, the receipt of funds for an existing contract as a result of a false claim constitutes a violation of 31 U.S.C. § 3729 and Art. XIII of the New York Finance Law.

91. The United States of America and the State of New York have sustained damages, in an as yet undetermined amount, as a result of Siemens' violations.


**Count II. – Use of Substandard Materials**

92. Relator repeats all of the above allegations, with the same force and effect as if set forth in full.

93. By entering into the contracts for work at 26th Ward, WI 79E, WI 87E, Croton E1, Croton E2, Sharon, and B&E Controls with the NYCDEP, Siemens specifically agreed not to use substandard materials.

94. Relator repeats all of the above allegations, with the same force and effect as if set forth

in full herein.

95.    Siemens purposefully used substandard electrical conduits with counterfeit underwriter's laboratory labels on them in concrete pours. It remains unclear how many of these substandard electrical conduits remain in the facilities.

96.    Siemens submitted "claims" for payment based upon a requirement that was not met in their agreement.

97. Request for payment of contract work not fulfilled constitutes a "claim" within the meaning of the Federal False Claims Act, 31 U.S.C. § 3729 et seq. and the NY False Claims Act, N.Y. State Fin. § 188(2).

98.    Siemens submitted claims for payment of expenses under this contract with the specific intention of having such claims "paid or approved" by the United States of America (31 § U.S.C. 3729 (a) (2)) or "reimburse[d to] such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded" by the City of New York.

99.    Siemens obtained funds under this contract from the United States of America and the State of New York based upon its false claims.

100.    Upon information and belief, the receipt of funds for an existing contract as a result of a false claim constitutes a violation of 31 U.S.C. § 3729 and Art. XIII of the New York Finance Law.

101.    The United States of America and the State of New York have sustained damages, in an as yet undetermined amount, as a result of Siemens' violations.


**Count III. – License Fraud**

102.    Relator repeats all of the above allegations, with the same force and effect as if set forth in full herein.

103.    The City of New York requires licensure as wither a Master or Special Electrician in order to perform electrical work. New York, N.Y., Administrative Law § 27-3017(a)(1).

104.    The law is further restrictive prohibiting advertising oneself as a licensed electrician or otherwise falsely representing oneself as a licensed electrician if not licensed as either a Master Electrician or Special Electrician. New York, N.Y., Administrative Law § 27-3017(a)(1).

105.    By entering into the contracts for the electrical work at 26th Ward, WI 79E, WI 87E, Croton E1, Croton E2, Sharon, and B&E Controls with the NYCDEP, Siemens was obligated to employ a full-time corporate officer who was a licensed Master Electrician.

106.    Siemens purposefully created a scheme in which it sought to escape liability by not maintaining a full-time Corporate Officer who was a licensed Master Electrician and instead tried to hide this by paying a licensed Master Electrician to use his license. When his license was not renewed, this was not discovered by the NYDOI for over a year.

107.    Siemens submitted "claims" for payment based upon a requirement that was not met in their agreement.

108.    Request for payment of contract work not fulfilled constitutes a "claim" within the meaning of the Federal False Claims Act, 31 U.S.C. § 3729 et seq. and the NY False Claims Act, N.Y. State Fin. § 188(2).

109.    Siemens submitted claims for payment of expenses under this contract with the specific intention of having such claims "paid or approved" by the United States of America (31§ U.S.C. 3729 (a) (2)) or "reimburse[d to] such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded" by the City of New York.

110.    Siemens obtained funds under this contract from the United States of America and the State of New York based upon its false claims.

111.     Upon information and belief, the receipt of funds for an existing contract as a result of a false claim constitutes a violation of 31 U.S.C. § 3729 and Art. XIII of the New York Finance Law.

112.     The United States of America and the State of New York have sustained damages, in an as yet undetermined amount, as a result of Siemens' violations.

## RELIEF

113.     On behalf of the United States and the State of New York, qui tam Relator/Plaintiff seeks to receive monetary damages equal to three times that suffered by the United States and the State of New York.   In addition, qui tam Relator/Plaintiff seeks to receive all civil penalties on behalf of the United States and the State of New York in accordance with the Federal False Claims Act and the New York State False Claims Act.

114.     Qui tam Relator/Plaintiff seeks to be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act.

115.     Qui tam Relator/Plaintiff seeks to be awarded the maximum amount allowed pursuant to N.Y. State Fin. § 190(6).

116.     Qui tam Relator/Plaintiff seeks to be awarded all costs and expenses for this action, including attorneys' fees and court costs.

117.     Qui tam Relator/Plaintiff seeks to be awarded all other relief on behalf of qui tam Relator/Plaintiff or the United States or the State of New York to which either may be entitled and that the Court deems just and proper.

## PRAYER

WHEREFORE, qui tam Relator/Plaintiff prays that this Court enter judgment on behalf of qui tam Relator/Plaintiff and against Siemens for the following:

a.     Damages in the amount of three (3) times the actual damages suffered by the United States and the State of New York as a result of Siemens's conduct;

b.   Civil penalties against Siemens equal to $11,000 for each violation of 31 U.S.C. § 3729;

c.   Qui tam Relator/Plaintiff be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

d.   Qui tam Relator/Plaintiff be awarded the maximum amount allowed pursuant to Art. XIII §190 (6) of the New York Finance Law.

e.   Qui tam Relator/Plaintiff be awarded all costs and expenses of this litigation, including attorneys' fees and costs of court; and

f.   All other relief on behalf of qui tam Relator/Plaintiff or the United States Government or the Government of the State of New York to which either may be entitled and that the Court deems just and proper.

### VII.   DEMAND FOR JURY TRIAL

120.   Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury.

Dated February 23, 2012

**UNITED STATES OF AMERICA, STATE OF NEW YORK, ex rel. Clifford Weiner**

Respectfully submitted,

LAW OFFICE OF SEAN R. CALLAGY, ESQ.

*Michael Smikun*

Michael Smikun, Esq.
650 From Road, Suite 565
Paramus, New Jersey 07652

**ATTORNEYS IN CHARGE FOR QUI TAM RELATOR/PLAINTIFF**