<u>DISCLOSURE STATEMENT</u>

UNITED STATES OF AMERICA, ex rel., CLIFFORD WEINER

Plaintiff

v.

SIEMENS AG, SIEMENS CORPORATION, SIEMENS
INDUSTRY, SIEMENS SCHLESINGER ELECTRIC AND JOHN DOE 1 THROUGH 100
DEFENDANTS.

Defendants

Provided to the Attorney General of the United States and
the United States Attorney for the Southern District of New York
February 27, 2012

## Introduction

This is an action to recover damages sustained by the government of the United States and the State of New York by virtue of the defendants' repeated and systematic violations of 31 U.S.C. §§ 3729–3732 ("False Claims Act" or "FCA") and Art. XIII of the New York State Finance Law ("NY False Claims Act" or "NYFCA").  The defendants have violated FCA and NYFCA by knowingly submitting, causing to be submitted or conspiring to submit false claims for construction contracts.

The FCA, 31 U.S.C. § 3729 et seq. permits individuals with knowledge of fraud against the government to bring suit on the government's behalf and to share in any recovery.   In accordance with 31 U.S.C. § 3730(b)(2), *qui tam* plaintiff, Clifford Weiner, hereby submits the required Disclosure Statement containing substantially all evidence and information he now possesses relating to the complaint in action.

## Summary of Allegations

This case alleges that defendants submitted false claims for payments based upon unfulfilled requirements in existing agreements.  Defendants have a systematic pattern and practice of submitting such claims with full knowledge that the requirements of the agreements have not been met.  Defendants failed to meet the Minority Business Enterprise requirement for receiving funds through the New York City Department of Environmental Protection ("NYDEP") and the New York City Department of Environmental Protection ("NYCDEP"). The defendants purposefully used materials they knew to be substandard and thus violative of the agreement.  The defendants failed to obtain the proper electrician license and violated New York City municipal law by entering into contracts for electrical work.  For each of the above

violations of legal duties, defendants submitted "claims" for payment based upon a requirement that was not met.

## The Parties

### A. *Qui Tam* Plaintiff

Clifford Weiner ("Weiner") formed and acted as principal for DDR Construction Services, Inc. ("DDR") from 2004 to 2010.  DDR is a New Jersey corporation that provides consulting and other services to entities within the construction industry.  DDR brings together companies within the construction industry to compile bids for construction projects.

Weiner earned his Bachelor of Science in Mechanical Engineering in 1979 from the United States Merchant Marine Academy; and has been involved in the electrical field of the construction industry in and around the New York City Metropolitan area for more than a decade.  He served as Vice President of Sepco Electric Contractors from 2000 to 2003.

### B. Defendants

Siemens Aktiengesellschaft   ("Siemens AG") is a multinational corporation organized under the laws of the Republic of Germany.  The principal offices are located in Munich and Berlin, Germany.   The company was founded in 1847 and is currently Europe's largest engineering company.  Defendant Siemens AG may be served with process via its registered agent at Wittelsbacherplatz 2 Munich D-80333, Germany.

Siemens Corporation is a United States subsidiary of Siemens AG.  The company is incorporated under the laws of Delaware with a principal place of business in New York.  It may be served through its registered agent, The Corporation Trust Co., Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware  19801.

Siemens Industry, Inc. (formerly Siemens Energy and Automation, et. al.) is a subsidiary of Siemens AG organized under the laws of Delaware.  It may be served through its registered agent at 170 Wood Avenue South, Iselin, New Jersey 08330.

Siemens-Schlesinger Electric, LLC ("SEC") is a subsidiary of Siemens AG organized under the laws of Delaware and authorized to do business in New York as a limited liability company.  It may be served rough its registered agent at 600 East 125th Street, New York, NY 10035.

Defendants Siemens AG, Siemens Corporation, Siemens Industry, Inc., and Siemens-Schlesinger Electric, LLC referred to collectively at "Siemens."

## Background

### A.  The Law

Under Executive Law § 310(7) in order for a business enterprise to be classified as a "Minority-owned business enterprise," it must meet the following six criteria.  First, the business must be "at least fifty-one percent owned by one or more minority group members."  Executive Law § 310(7)(a).  A minority group member is defined as follows:

> [A] United States citizen or permanent resident alien who is and can demonstrate membership in one of the following groups:
> (a) Black persons having origins in any of the Black African racial groups;
> (b) Hispanic persons of Mexican, Puerto Rican, Dominican, Cuban, Central or South American of either Indian or Hispanic origin, regardless of race;
> (c) Native American or Alaskan native persons having origins in any of the original peoples of North America.
> (d) Asian and Pacific Islander persons having origins in any of the Far East countries, South East Asia, the Indian subcontinent or the Pacific Islands.

N.Y. Exec. Law § 310(8).    Additionally, the ownership must be "real, substantial and continuing," the minority ownership must "exercise[]the authority to control independently the day-to-day business decisions of the enterprise," the enterprise must be authorized to do business

in New York state and be independently owned and operated, and the enterprise must be a "small business."  A small business is defined as follows:

> [A] business which has a significant business presence in the state, is independently owned and operated, not dominant in its field and employs, based on its industry, a certain number of persons as determined by the director, but not to exceed three hundred, taking into consideration factors which include, but are not limited to, federal small business administration standards pursuant to 13 CFR part 121 and any amendments thereto. The director may issue regulations on the construction of the terms in this definition.

N.Y. Exec. Law § 310(20).  Finally, in order to be considered a minority-owned business enterprise the enterprise must be "owned by an individual or individuals, whose ownership, control and operation are relied upon for certification," and those individuals must not have a net worth in excess of three million five hundred thousand dollars (adjusted according to the previous year's for inflation according to the consumer price index)

The City of New York requires licensure as wither a master or special electrician in order to perform electrical work.  N.Y. Administrative Law § 27-3017(a)(1).  The statute explicitly states "it shall be unlawful for any person to perform electrical work except under a license issued to a master electrician or special electrician as provided in this chapter."  *Id*.  The law is

Under Wicks Law (N.Y. Gen. Mun. Law § 101) public officials charged with entering into contract for construction, "when the entire cost of such public work shall exceed three million dollars in the counties of the Bronx, Kings, New York, Queens, and Richmond… shall prepare separate specifications for…" plumbing, heating ventilation and air conditioning, and electrical wiring and lighting.  N.Y. Gen. Mun. Law § 101(1).  The law requires that "[s]uch specifications shall be drawn so as to permit separate and independent bidding upon each of the above three subdivisions of work."  N.Y. Gen. Mun. Law § 101(2).  The three subdivisions of work are to then be awarded separately.  *Id*.

The City of New York requires licensure as wither a master or special electrician in order to perform electrical work.  N.Y. Administrative Law § 27-3017(a)(1).  The statute explicitly states "it shall be unlawful for any person to perform electrical work except under a license issued to a master electrician or special electrician as provided in this chapter."  *Id*.  The law is

further restrictive prohibiting advertising oneself as a licensed electrician or otherwise falsely representing oneself as a licensed electrician if not licensed as either a master electrician or special electrician. *Id*.

### Defendants' Fraudulent Practices

In 2002, Weiner was approached by Siemens Westinghouse Industrial Services about working in partnership with them to pursue NYCDEP prime electrical contracts.  In the years 2002 and 2003, Weiner and Siemens unsuccessfully attempted to secure several prime contracts.

In 2002, Weiner began a relationship with First Keystone Consultants ("Keystone") and Schlesinger Electrical Contractors, Inc. ("SEC"). This relationship was established to bid on public works electrical projects including those with NYDEP, the NYCDEP, and other opportunities that may become available.

Weiner formed DDR Construction Services ("DDR") in 2004 to secure, partner in, and manage for SEC a five and one half million dollar ($5.5 million) electrical contract at the Coney Island Sewage Treatment Plant ("CIWP").  It became apparent to Weiner that in order to successfully pursue projects of the size and capacity that Siemens envisioned it would require a scale and capabilities that exceeded DDR's abilities. Weiner determined that the logical solution was to build on the successful partnership created for the CIWP.  The relationship between DDR, Keystone, and SEC was reduced to a partnership agreement which created SFD Associates ("SFD") so as to present a single entity for bidding on projects.

After a number of unsuccessful submissions for projects, Weiner reached out to Jeff Duerlien at Siemens Electric and Automation ("SEA," later to be merged into Siemens Industry) to discuss the possibility of creating a Joint Venture to pursue further bids. This Joint Venture was ultimately established by the creation of a Limited Liability Company, specifically SSE.

The arrangement with SSE provided that contracts stemming from bids won would be split between Siemens and SEC (which held its interest in SSE in trust for the SFD partners). This structure was created to comply with the requirements of the Wicks Law that one partner of a joint venture bidding on a prime electrical contract hold a master electrician's license. Siemens was aware at all times of the relationship. Through this arrangement, SSE began to bid for projects.

As a result of this arrangement, SSE submitted successful bids for seven projects with the NYCDEP. These projects included the following: 26th Ward for $21,280,000; WI 79E for $29,425,855; WI 87E for $11,745,000; Croton E1 for $134,680,000; Croton E2 for $37,678,000; Sharon for $2,700,000; and B&E Controls for $2,100,000.   The NYCDEP receives approximately eighty per cent of its funding from the New York State Revolving Clean Water Fund which in return is funded by Federal Environmental Protection Agency ("EPA") through the Clean Water Revolving Fund.  Through his participation in these seven contracts supported by the NYCDEP, Weiner became aware of the false claims submitted by Siemens.

DDR was forced out of SFD by a fraudulent capital call designed to make it impossible for DDR to remain a member of this entity. After DDR was thrown out the fraudulent capitol call was rescinded, thus, SEC and Keystone were allowed to remain.

 Under existing law, only a licensed electrical contractor is eligible to be awarded a prime electric contract. The exception to this is a joint venture where one member is a licensed electrical contractor.  SSE knowingly falsely certified to the NYCDEP that it was a joint venture whereas in reality it was an LLC.[1]  A May 10, 2005 internal email from Jeff Duerlein

---

[1] See Exhibit A, relevant pages from 5 Bid applications wherein SSE certified that they were a Joint Venture.

of Siemens (SEA) titled "Notes from Board" clearly stated Siemens intent to mislead the NY DEP and stated:

> 4. LLC Electrical License
>
> - Need to portray the LLC as a JV with the NY DEP. There is a history of JVs in the NY DEP bids.[2]

After SSE was low bid on the Wards Island 79E project, NYCDEP requested the joint venture agreement between SSE and SEA.[3] Rather than produce any proof of a joint venture between the two, Siemens elected to fraudulently represent SSE as a Master Electrician business with Bronislav (Steve) Ostrovsky ("Ostrovsky") as its licensed master electrician.

To avoid the cost and legal mandate of a full time corporate officer who held a master electrician's license as the responsible representative of SSE, Siemens instead negotiated an agreement with Steve Ostrovsky ("Ostrovsky") to use his license for a fee of $1500 per month.[4] Neither SSE nor Ostrovsky ever intended for Ostrovsky to act as a bona fide officer of SSE with a Master Electrician's license as required, but rather SSE's entire relationship with Ostrovsky was a sham by SSE to use Ostrovsky's dormant license so Siemens could bid on, and ultimately secure public works contracts.  Siemens submitted false affidavits and claims to the city of New York relating to Ostrovsky and the use of his license. Specifically, on February 10, 2006, Robert H. Rigsby, in-house counsel to Seimens USA and Secretary to Schlesinger Siemens Electrical, LLC sent a letter to the City of New York stating that Bronislav Ostrovsky was Vice President, Electrical of Siemens Schlesinger Electric and a member of the Board of Managers.[5]

---

[2] See Exhibit B, May 10, 2005 email from Jeff Duerlein entitled Notes from Board- April 27th about Paedergat.
[3] See Exhibit C, Letter from NYCDEP requesting Joint Venture agreement.
[4] See Exhibit D, February 7, 2006 email from Duerlein outlining the intent and scheme to use Ostrovsky's license.
[5] See Exhibit E, February 10, 2006 letter from Robert H. Rigsby to The City of New York.

Rigsby did not submit a notarized copy of the actual minutes of the Board naming Ostrovsky to the Board as required, but instead submitted a Certification, dated March 6, 2005 and signed by the Managers stating that the Board elected Ostrovsky as an Officer on January 26, 2006.

The January 26, 2006 date was fraudulently offered to the City as a ruse to make it appear that Ostrovsky was added to the Board before this issue arose, but in fact, that date predates Duerlein's February 6, 2006 email wherein Duerlein stated that the "LLC will be contracting with a gentlemen named Bronislav Ostrovsky (Steve) to act as the VP of Electrical Operations for the LLC. This position was granted to him so that he can carry the Electrical Contracting License for the LLC. We will pay him some nominal fee around $1000-$1500 per month for this service. To do this, we will need some agreement/contract between Steve and the LLC. Do we have a standard agreement in which we can start with. What do we need to do to get this done."[6]  Clearly, as of February 6, 2006, the date of Duerlein's email, no formal agreement as to the scheme involving Ostovsky had been executed and in no way had Ostrovsky been named to the Board some 12 days earlier as each member of the Board swore to in their Certification, and Rigsby, as Secretary and counsel to Siemens USA stated in his letter.

Moreover, at all times that Ostrovsky's license was registered to SSE, he was in fact a full-time working employee of Five Star Electrical Contractors,[7] Inc. in contravention of § 27-3013 Business Establishments Master Electricians And Special Electrician, which requires that a Master Electrician can only represent one business and that the master electrician must devote his full time to that business.

---

[6] See Exhibit D, *supra.*
[7] See Exhibit F, Affidavit of Ira Grunther, Senior Vice President of Five Star Electric.

Ostrovsky did not renew his license in December 2007.  SSE concealed this fact from the City of New York by failing to notify the City of that fact, despite their affirmative obligation to do pursuant to § 27-3013 (8).  Thus, for well over a year until discovered by NYCDEP and the New York City Department of Investigation ("NYCDOI"), SSE continued to operate itself under the fraudulent umbrella of a master electrician business despite the fact that the very license they had fraudulently paid to use had been expired for over eighteen months.[8] Upon discovery, Siemens advised the city of New York that Ralph Scotti ("Scotti") would assume the role of SSE's Master Electrician. Siemens was once again engaging in the same type of sham relationship as it relates to the Master Electrician requirement.[9]

Scotti's license was also issued based upon fraudulent documentation submitted by Siemens.  Roland Dung, CEO of SSE fraudulently represented to Michael Borsykowsky of NYCDEP that Scotti was superintendent of SSE.   This is a lie. Scotti is in fact the superintendent for SEC, a continuing going concern as a Master Electrician Business.[10]  Scotti, like Ostrovsky cannot serve as a Master Electrician for two separate master electrician businesses.  As of today, Scotti's license serves as the master electrician for SSE even though he is a full time employee and superintendent of SEC.

Federal regulations mandate that the contracts issued by NYCDEP have set asides for Minority Business Enterprises ("MBE"). To this end, Siemens engineered a relationship with J&R Rey Electrical Contractors ("J&R"). Under the guise of this relationship many frauds were committed.  For example, as a condition of being a participant on one project known as the 26th Ward Project awarded in September, 2005, Siemens fraudulently required that J&R purchase

---

[8] See Exhibit G, email between Mark Reed and Steve Hammel regarding lack of Electrical License during the entire year of 2008.
[9] See Exhibit H, email from Roland Dung, CEO of SSE to Michael Borsykoski.
[10] See Exhibit I, 2008 SEC Ledger showing Scotti as employee and SSE NY License showing Scotti as master electrician.

approximately $2.4 million of equipment manufactured and sold by Siemens, out of the $3.6 million that J&R was to receive from the contract.[11]   In addition to being an illegal kickback scheme, the requirement that J&R purchase this equipment from SEA, at a price set by SEA, also constitutes a fraudulent representation by Siemens that J&R Rey was performing a "useful commercial function" as required by the MBE requirements.

In July 2007, the NYCDEP questioned the equipment purchase and other issues as it related to the use of J&R Rey as an MBE, stating their concern that J&R Rey was simply being used by Siemens as a "passive conduit of funds."[12]   As a result, Siemens responded by creating and submitting a false quote to the NYCDEP that they claim was previously submitted to J&R Rey, purportedly prior to purchase of the equipment, which they claim proves J&R Rey independently chose to purchase the equipment from Siemens.[13]   Remarkably, Siemens was not careful in creating this false document which purported to be a quote for equipment prior to purchase because they mistakenly dated it June 1, 2007, some months *after* the Siemens equipment had already been purchased and after the equipment had been substantially installed. J&R Rey was also forced by Siemens to submit $360,000 in invoices for future labor.  These checks were then cashed at check cashing facilities in New York City.[14]

Unbeknownst to John Rey, Siemens continued to fraudulently use J&R Rey to win MBE contracts even after Siemens terminated J&R Rey.[15]   Siemens had previously included J&R Rey as the MBE subcontractor for the five aforementioned projects.  Siemens later constructively terminated J&R Rey from all five projects by approximately October, 2008.  In January 2009, Kenneth Schill fraudulently submitted a document to the NYCDEP requesting approval for J&R

---

[11] See Exhibit J, August 11, Affidavit of John Rey.
[12] See Exhibit K, July 13, 2007, Letter from Alan Wasserman to Jeff Durlein.
[13] Exhibit L, Email from Durlein to Wasserman with Scope of Supply attachment dated June 1, 2007.
[14] See Exhibit I, Affidavit of John Rey.
[15] See Exhibit M, letter from J&R Rey.

Rey as the MBE subcontractor for the project known as WI79E, after his termination from that project. J&R Rey did not learn that Siemens continued to submit his name as an MBE subcontractor until sometime around May 2010, wherein he learned of this fact through a FOIA request.

At the direction of Robert Solomon, general Manager of SSE, Rey was also required to kick back approximately 70% or $111,000 of the $153,000 handling costs that were to be paid by Siemens to J&R Rey for processing the equipment order for the 26 Ward Project, that Rey was entitled to pursuant to his contract.[16] A similar scheme was used by Siemens to create a pass through for equipment purchased by A-Tech Electric.[17] A-Tech Electric replaced J&R Rey as the MBE subcontractor on the project known as WI 87E. A-Tech Electric was also required to purchase Siemens equipment as part of their contract with SEC.[18]

SEC and SSE also conspired to set up a sham invoice system to allegedly allow corporate officer Joseph Guddemi to receive payment while avoiding having to pay his IRS lien. Joseph Guddemi ("Guddemi") functioned as Chief Financial Officer of SSE.[19] Allison Consulting is a company owned in Guddemi's daughter's name. Guddemi was allegedly the only employee of Allison Contracting. Jo Guddemi is listed with New York State as the principal officer of Allison Consulting and the registered address of Allison is Guddemi's personal residence.[20] Guddemi personally told Relator that he had a prior IRS lien against him for his roles in schemes to defraud the United States Government of tax revenue while he was an Officer of PEM Electric Corp.[21] Allison Consulting submitted all invoices for Guddemi's

---

[16] See Exhibit N, Statement and Invoices of John Rey.
[17] See Exhibit O, Dung Letter to NYCDEP and notice of revised MBE.
[18] See Exhibit P, A-Tech Invoice for Siemens equipment.
[19] See Exhibit Q, Guddemi Affidavit, paragraph 2.
[20] See Exhibit R, Allison Consulting Corporate Document.
[21] See In re PEM Electrical Corp, Case No.:03-13358, U.S. Bankruptcy Court, Southern District of New York.

services to SSE to SEC. SEC paid the Allison invoices on behalf of SSE, then billed SEC.[22] During the same time period as the above questionable corporate activities were occurring. Guddemi was on the payroll of J&R.[23]  Guddemi was not performing any duties for J&R Rey but  Rey was required to put Guiddemi on his payroll for a nominal amount so the IRS could garnish those wages and he not the more lucrative wages paid to Allison.

Relator had reason to believe SSE installed unapproved, substandard electrical conduits and fittings on the project known as Croton E1 and E2.  Relator via FOIA request received copies of construction deficiency reports for the projects.  CD # 312E1-037 acknowledges that substandard couplings were used in the Croton project and directed SSE to replace the couplings.[24]  These couplings were from a Chinese company that had previously created fraudulent underwriters' laboratory labels for their products.[25]  A subsequent investigation that was performed at the direction of the New York District Attorney's Office based upon the information provided by Relator led to a finding that the couplings that were actually installed were indeed the improperly galvanized fittings.[26]  These inferior couplings do not conform with the requirements of the Project, were never approved for the Project and could potentially weaken the entire structure over time.

By information and belief, Siemens has engaged in a number of other fraudulent schemes throughout the United States and is subject to many deferred prosecution agreements that may be violated by further fraudulent activity in the company.

---

[22] See Exhibit S, Invoices for Allison Consulting.
[23] See Exhibit T, Proof of J&R payroll to Guddemi and Letter for John Rey.
[24] See Exhibit U, Construction Deficiency Report.
[25] See Exhibit V, UL warning.
[26] See Exhibit W, Test Results for Coupling and Conduit.